UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *vs.* | ) | 1:12-cr-00042-JMS-TAB-1 |
| | ) | |
| DWAN TAYLOR, | ) | |
| *Defendant.* | ) | |

## ORDER

Presently pending before the Court is Defendant Dwan Taylor's Motion to Suppress. [Dkt. 32.]  For the reasons explained, the Court **DENIES** the motion.

## I.
### BACKGROUND

The parties do not dispute the facts necessary to resolve Mr. Taylor's Motion to Suppress. Accordingly, and with the agreement of the parties, the Court did not hold a hearing with respect to this motion.  The Court draws the relevant facts from the parties' briefs and the exhibits attached thereto.

On June 27, 2011, Detective Sergeant Garth Schwomeyer of the Indianapolis Metropolitan Police Department received a tip that Defendant Dwan Taylor was in possession of cocaine and several firearms.  [Dkt. 33-1 at 5.]  The next day, Sergeant Schwomeyer researched Mr. Taylor's criminal history and found that he had a 1997 conviction for the possession of narcotics. [*Id.*]  Sergeant Schwomeyer also learned that Mr. Taylor was connected to an Indianapolis residence, where, on June 30, 2011, he believed he observed a drug transaction take place.  [*Id.* at 5-6.]

On August 15, 2011, Sergeant Schwomeyer received further information from a confidential informant that Mr. Taylor was involved in cocaine trafficking.  [*Id.* at 6.]  After further

- 1 -

surveillance and investigation, Sergeant Schwomeyer learned on September 13, 2011, that Mr. Taylor had purchased and registered a silver 2006 Chevrolet Impala.  [*Id.* at 7.]  Six days later, law enforcement sought to track Mr. Taylor's car via a Global Positioning System ("GPS").  To this end, Sergeant Schwomeyer submitted an affidavit in support of a Petition to Authorize Installation and Use of a Global Position System Tracking Unit ("Petition") filed with the Marion Superior Court by Marion County Prosecutor Andrea Props.  [*Id.* at 1-7.]

In the Petition, Ms. Props sought judicial authorization to attach a Global Position System Tracking Unit ("GPS Unit") to Mr. Taylor's Impala for sixty days.  [*Id.* at 1.]  According to the Petition, law enforcement wished to attach the GPS Unit to Mr. Taylor's Impala "while the vehicle was either in a public place or upon private property where members of the general public would have access to such a vehicle" and stated that the GPS Unit "would be powered either by an internal battery or by connecting [the GPS Unit] to the battery of the vehicle."  [*Id.* at 1-2.]  The Petition was granted by Marion Superior Court on these terms and allowed law enforcement to attach the GPS Unit as requested.  [Dkt. 33-3.]  Although the record does not reflect where or when the GPS Unit was attached to Mr. Taylor's vehicle—or whether the GPS Unit was powered by the vehicle's battery—it is undisputed that the GPS Unit was attached to his vehicle, and the Government represents that the GPS Unit aided law enforcement in tracking Mr. Taylor to a storage unit he rented at Hoosier Storage.  [Dkt. 35 at 3 n.3.]

On October 6, 2011, Sergeant Schwomeyer sought a warrant from the Marion Superior Court to search Hoosier Storage Unit #1134, which he believed to be rented by Mr. Taylor. [Dkt. 33-4.]  Among other things, Sergeant Schwomeyer's affidavit in support of the search warrant stated that, on October 3, 2011, "surveillance indicated that Taylor went to the Hoosier Storage facility . . . [and] accessed a storage locker and left the facility after only a few minutes."

[*Id.* at 4.]  Sergeant Schwomeyer further attested that a narcotics dog was brought to smell the exterior door of Unit #1134 at Hoosier Storage and gave a positive indication for the presence of narcotics.  [*Id.*]  Based on Sergeant Schwomeyer's information, a search warrant was issued granting law enforcement the authority to search Unit #1134 at Hoosier Storage.  [Dkt. 33-5.] Law enforcement officers executed the search warrant and, among other things, found 752.61 grams of cocaine and four firearms in the storage unit.  [Dkt. 33-6.]

Mr. Taylor was subsequently charged in a five-count Indictment by a federal grand jury of one count of possession with the intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841 (b)(1)(B)(ii), and four counts of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  [Dkt. 1.]  Mr. Taylor then filed the instant motion to suppress the evidence recovered from the search of Unit #1134, arguing that the information in support of the search warrant was obtained in violation of his Fourth Amendment rights and that the search warrant itself was defective.  [Dkt. 32.]  The Court concludes that law enforcement's use of the GPS Unit violated Mr. Taylor's Fourth Amendment rights, but the evidence obtained as a result of the violation should not be suppressed.

## II.
### DISCUSSION

Mr. Taylor seeks suppression of the evidence obtained during the search of Hoosier Storage Unit #1134 based on what he contends were several independent violations of his Fourth Amendment rights.  First, he contends that the attachment and use of the GPS Unit on his vehicle without probable cause or a search warrant was an unconstitutional search and seizure, and that because the information derived therefrom established his connection with Hoosier Storage Unit #1134, the evidence obtained from the unit must be suppressed.   [Dkt. 33 at 5-10.]  Second, he argues that the search warrant for Unit #1134 was defective because law enforcement omitted the

material fact from the affidavit that the "surveillance" that led them to Hoosier Storage was GPS surveillance rather than human surveillance.  [*Id.* at 15.]  Third, he maintains that the warrantless dog sniff of Unit #1134 was an illegal Fourth Amendment search that, like the GPS Unit, led to the issuance of the search warrant and, ultimately, the discovery of the evidence in Unit #1134. [*Id.* at 15-20.]

The Court begins with a brief overview of Fourth Amendment law before turning to the asserted bases for suppression.  In the end, the Court concludes that only law enforcement's use of the GPS Unit constituted an illegal search under the Fourth Amendment, but that, even so, suppression is unwarranted.

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."  U.S. CONST. amend. IV.  It is well established, however, that a violation of this right does not automatically result in the suppression of the evidence discovered as a result of the violation.  *See Herring v. United States*, 555 U.S. 135, 140 (2009) ("We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation."); *United States v. Leon*, 468 U.S. 897, 905-06 (1984) (rejecting the contention that "the exclusionary rule is a necessary corollary of the Fourth Amendment").  Therefore, a defendant seeking the suppression of evidence must demonstrate (1) that a Fourth Amendment violation occurred and (2) the evidence discovered as a result of that violation should be suppressed.

**A.  The Use of the GPS Unit Violated Mr. Taylor's Fourth Amendment Rights, but the Evidence Discovered as a Result of this Violation Should Not be Suppressed**

1.  *The Use of the GPS Unit Violated Mr. Taylor's Fourth Amendment Rights*

Mr. Taylor presses two arguments as to why law enforcement's utilization of the GPS Unit violated his Fourth Amendment rights. First, he contends that the order from the Marion Superior Court authorizing the use of the GPS Unit did not comply with Federal Rule of Criminal Procedure 41(e)(2)(C), which sets forth specific requirements for the issuance of a warrant for a tracking device.[1]  [Dkt. 33 at 7-10.]  Specifically, Mr. Taylor argues that if "the government wants to prosecute [him] federally, [he] should be entitled to the federal protections provided in Rule 41 and the State officers should not be exempt from following its provisions."  [*Id.* at 10.]  The Government responds that Mr. Taylor fails to cite any authority in support of the proposition that the Federal Rules of Criminal Procedure "bind[] the actions of state law enforcement in what was then a purely criminal investigation."  [Dkt. 35 at 4 n.4.]  Mr. Taylor views this statement as the Government mistaking "who has the burden . . . to cite authority that Rule 41 does not bind state officers"; he asserts that the Government should have to justify the search by citing such authority.  [Dkt. 39 at 7.]

Mr. Taylor's argument regarding who bears the burden misses the mark.  This is not a factual dispute where the failure to meet one's burden results in an adverse ruling.  It is a legal one.  At issue is whether—as a matter of law, given that the facts are undisputed—Rule 41 applies to actions of state law enforcement when conducting a state-law investigation.  The weight of legal authority clearly supports the Government's position that the Federal Rules of Criminal Procedure do not govern the actions of state law enforcement officers when, at least at the time

---

[1] Relatedly, Mr. Taylor contends that the order authorizing the utilization of the GPS Unit is not the equivalent of a search warrant issued after a finding of probable cause.  [Dkt. 33 at 10-15.]  In response, for the purposes of this motion only, the Government concedes that "the order issued by the Marion County Court is not the equivalent of [a] search warrant under Rule 41," [dkt. 35 at 4 n.4], and does not otherwise argue that the affidavits attached to the Petition were sufficient to establish probable cause.  The Court must accept the Government's concession, and because the Government does not argue that probable cause otherwise existed, does not evaluate whether the affidavits were sufficient to establish probable cause.

of the actions in question, there was no federal involvement in the investigation.  *See United States v. Claridy*, 601 F.3d 276 (4th Cir. 2010) (holding that Federal Rule of Criminal Procedure 41 did not apply because the proceeding granting the warrant was not a "federal proceeding"; even though the investigation was conducted by a joint federal and state task force, the warrant alleged violations of state law, the warrant authorized state officers to exercise the warrant, and the warrant was returnable to state court); *United States v. Brewer*, 588 F.3d 1165, 1171 (8th Cir. 2009) (holding that Federal Rule of Criminal Procedure 41 only applies when there is "significant federal involvement"); *United States v. Barrett*, 496 F.3d 1079, 1090 (10th Cir. 2007) (holding that Federal Rule of Civil Procedure 41 does not apply even though federal officers executed the search because there was otherwise only "minimal federal involvement" as indicated by the facts that "the warrant was requested by a state law enforcement officer, was issued by a state magistrate judge, and the original plan had been for only state law enforcement officers to execute the warrant").  Indeed, by its own terms, the Rule only governs the authority to issue warrants "[a]t the request of a *federal* law enforcement officer or attorney for the government."  Fed. R. Crim. P. 41(b) (emphasis added); *see United States v. Griffin*, 501 Fed. Appx. 751, 756 (10th Cir. 2012) ("Rule 41, by its express text, is applicable in situations '[w]hen a federal law enforcement officer or an attorney for the government presents an affidavit in support of a warrant.'") (citation omitted).  Accordingly, as the record does not reveal *any* federal involvement in the investigatory conduct in question, Mr. Taylor's reliance on violations of Federal Rule of Criminal Procedure 41 fails to advance his case for suppression.

Second, and wholly apart from his Rule 41 argument, Mr. Taylor contends that the use of the GPS Unit violated his Fourth Amendment rights under the dictates of *United States v. Jones*, 132 S. Ct. 945, 949 (2012).  In *Jones*, the United States Supreme Court held that "the Govern-

ment's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" under the Fourth Amendment. *Id.* at 949. The Government acknowledges that, under *Jones*, the use of the GPS Unit constituted a search within the meaning of the Fourth Amendment. [Dkt. 35 at 3.]

The Court agrees with the parties that *Jones* dictates that a Fourth Amendment search occurred when law enforcement attached and utilized the GPS Unit on Mr. Taylor's vehicle. The search occurred without a warrant and is therefore a violation of the Fourth Amendment.[2] As stated above, however, the Court still must assess whether suppression of the subsequently discovered evidence is warranted, and it is to this question the Court now turns.

> 2.     *Although the* Davis *Good-Faith Exception Does Not Apply, Suppression is Nonetheless Unwarranted Because Law Enforcement's Reliance on the Judicial Authorization They Received to Use the GPS Unit was Objectively Reasonable*

The Government contends that the evidence obtained as a result of the illegal search should not be suppressed for two reasons: (1) the good-faith exception to the exclusionary rule set forth in *Davis v. United States*, 131 S. Ct. 2419 (2011), applies, [*id.* at 3-6]; and (2) law enforcement relied in good faith on the judicial authorization they received to use the GPS Unit, [*id.* at 5]. The Court addresses each argument in turn, concluding that the *Davis* good-faith exception does not apply, but that suppression is unwarranted because law enforcement's reliance on judicial authorization to use the GPS unit was objective reasonable.

---

[2] The Court notes that the parties did not pursue the avenue left open in *Jones*—that, "even if the attachment and use of [a GPS] device [is] a search, it [is] reasonable—and thus lawful—under the Fourth Amendment because 'officers had reasonable suspicion [or] probable cause, to believe that [the defendant] was [involved in criminal activity]." *Jones*, 132 S. Ct. at 954. The Supreme Court did not resolve this question in *Jones* because it was not argued before either the district court or the D.C. Circuit. The Court follows suit. Because the government did not pursue this argument, the Court cannot consider it. *See Williams v. Dieball*, 724 F.3d 957, 963 (7th Cir. 2013)

a.    The *Davis* Good-Faith Exception Does Not Apply

The Government contends that, because the search at issue occurred prior to the Supreme Court's issuance of *Jones*, the law enforcement officers had a good-faith belief that their conduct was not a Fourth Amendment search under then-controlling Seventh Circuit precedent, *United States v. Cuevas-Perez*, 640 F.3d 272 (7th Cir. 2011), *vacated and remanded by Cuevas-Perez v. United States*, 132 S. Ct. 1534 (2012), and *United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007). [Dkt. 35 at 3-6.]  Mr. Taylor maintains that the good-faith exception does not apply, as the two Seventh Circuit cases on which the Government relies are distinguishable from the instant case in ways that precluded the law enforcement officers from reasonably relying on them as authority to use the GPS Unit in the manner they did.  [Dkt. 39 at 2-7.]  The Court agrees with Mr. Taylor that those cases would not support a reasonable basis for a good faith belief that the GPS Unit could be attached without a warrant.

The good-faith exception provides that evidence obtained as a result of a Fourth Amendment violation should not be suppressed if law enforcement had a "reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment."  *Leon*, 468 U.S. at 909 (citations and quotation marks omitted).  Exclusion of such evidence is unwarranted because the exclusionary "rule's sole purpose . . . is to deter future Fourth Amendment violations," *Davis*, 131 S. Ct. at 2426, and for an officer whose conduct is "objectively reasonable[,] . . . [e]xcluding [such] evidence can in no way affect his future conduct unless it is to make him less willing to do his duty," *Leon*, 468 U.S. at 919-20.  Simply put, "[w]here the official action was pursued in complete good faith . . . the deterrence rationale loses much of its force."  *Id.* at 919.

Under this same logic, the Supreme Court recently held that the good-faith exception applies to "searches conducted in objectively reasonable reliance on binding appellate precedent."

*Davis*, 131 S. Ct. at 2426.  In *Davis*, at the time of the search at issue, the Eleventh Circuit had "established a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest."  131 S. Ct. at 2428.  In conducting the search in *Davis*, law enforcement followed Eleventh Circuit precedent "to the letter"; the "officers' conduct was in strict compliance with then-binding Circuit law and was not culpable in any way."  *Id.*  In the Supreme Court's view, law enforcement's strict reliance on then-binding precedent "doom[ed]" the defendant's claim.  *Id.*  The Supreme Court explained:  "About all that exclusion would deter in this case is conscientious police work.  Responsible law-enforcement officers will take care to learn what is required of them under Fourth Amendment precedent and will conform their conduct to these rules.  But by the same token, when binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities."  *Id.* at 2429 (emphasis in original) (citations and quotation marks omitted).

Like the Supreme Court, to determine whether the *Davis* good-faith exception applies in the instant case, the Court must first set forth the contours of the then-binding Seventh Circuit precedent—*Garcia* and *Cuevas-Perez*—and determine whether law enforcement's reliance on these precedents as authorization for their use of the GPS Unit was objectively reasonable.  Beginning with *Garcia*, the Seventh Circuit held that the attachment and use of a GPS device on the defendant's car was not a search or seizure under the Fourth Amendment.  474 F.3d at 995-98.  There, law enforcement attached a "battery-operated" GPS device to the defendant's vehicle while it was parked on a public street.  *Id.* at 995.  It is unclear from the opinion, however, how long law enforcement intended to utilize the device.  Nevertheless, the Seventh Circuit held that there was not a Fourth Amendment seizure because the GPS device "did not affect the car's driv-

ing qualities, did not draw power from the car's engine or battery, did not take up room that might otherwise have been occupied by passengers or packages, [and] did not even alter the car's appearance."  *Id.* at 996.  Nor was there a Fourth Amendment search, at least under the facts of G*arcia*, as the GPS device was merely a substitute for an activity that itself was not a Fourth Amendment search, "namely following a car on a public street."  *Id.* at 997.

Over four years later—yet prior to the use of the GPS Unit in the instant case—the Seventh Circuit decided *Cuevas-Perez*, another case involving the warrantless use of GPS devices by law enforcement.   There, law enforcement placed a GPS device on the defendant's vehicle while it was parked in a public area.  *Cuevas-Perez*, 640 F.3d at 272.  The GPS device was intended to be used to track the defendant during a single interstate trip, and surveillance lasted approximately sixty hours.  *Id.* at 273.  The defendant moved to suppress evidence found as a result of this surveillance, arguing that the Seventh Circuit should follow *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), where the D.C. Circuit held that the warrantless, uninterrupted use of a GPS device on the defendant's vehicle for twenty-eight days constituted a Fourth Amendment search because, among other reasons, such a search "may reveal more than just the movements of a vehicle on public roads."  *Cuevas-Perez*, 640 F.3d at 274.

Notably, in analyzing the defendant's argument, the Seventh Circuit did not simply declare that *Garcia* held that the use of a GPS device is not a Fourth Amendment search and thus controlled the outcome of the case.  Instead, it framed the issue as follows:  "We are called on to decide whether the factually straightforward case before us implicates the concerns articulated in *Maynard*, or whether it is subject to the residual principle derived from [*United States v.*] *Knotts*[, 460 U.S. 276 (1983),] and *Garcia*, that GPS tracking does not constitute a search."  *Cuevas-Perez*, 640 F.3d at 274.  Without deciding whether it ultimately agreed with the result in

- 10 -

*Maynard*, *see id.* at 274 n.3, the Seventh Circuit held that *Maynard* was factually distinguishable from the case before it and thus *Maynard*'s holding was inapposite, *id.* at 274-76.   Specifically, the Seventh Circuit noted that (1) "[t]he 28-day surveillance in *Maynard* was much lengthier than the 60-hour surveillance in the case before us," (2) "[t]he case [before it] . . . involve[d] [only] a 'single-trip' duration of surveillance," and (3) "[u]nlike in *Maynard*, the surveillance here was not lengty and did not expose, or risk exposing, the twists and turns of [the defendant's] life, including possible criminal activities, for a long period."  *Id.* at 274-75.

In conclusion, the Seventh Circuit highlighted the fact that the purpose of the GPS was "only to record [the defendant's] trip across the country," and thus no warrant would be required even if "the *Maynard* analysis applied."  *Id.* at 275.  The Seventh Circuit recognized that, in this regard, its decision and "the present state of precedent provides only piecemeal guidance, but [this lack of guidance] . . . is only a reason that law enforcement may wish to obtain a warrant in close cases."  *Id.*

The parties disagree regarding what *Garcia* and *Cuevas-Perez* specifically held.   The Government contends that these cases "authorized warrantless installation and monitoring of GPS devices," and that law enforcement "acted in objectively reasonable reliance on [these] judicial precedent[s]" in utilizing the GPS Unit here.   [Dkt. 35 at 5-6.]  Mr. Taylor responds that the *Davis* good-faith exception does not apply here because, unlike in *Davis* where law enforcement "scrupulously adhere[d] to governing law," 131 S. Ct. at 2423, law enforcement here utilized the GPS Unit to track Mr. Taylor's vehicle in at least three ways that *Garcia* and *Cuevas-Perez* suggest may be violative of the Fourth Amendment, [dkt. 39 at 3-7].  Specifically, Mr. Taylor points to three differences between the instant case and *Garcia* and *Cuevas-Perez*: (1) law enforcement here sought to use the GPS Unit for up to sixty days; (2) law enforcement sought to

attach the GPS device "while the vehicle was either in a public place or upon private property where members of the general public would have access to such a vehicle," [dkt. 33-1 at 1-2]; and (3) law enforcement sought permission to utilize Mr. Taylor's vehicle's battery to power the GPS Unit.  [*See* dkt. 39 at 6-7.]

The Court agrees with Mr. Taylor that the three differences between this case and the then-binding Seventh Circuit precedent, taken together, preclude the application of the *Davis* good-faith exception in this case.  Simply put, law enforcement could not have objectively relied on *Garcia* and *Cuevas-Perez* when the cases do not explicitly, or for that matter implicitly, authorize the specific actions taken here, especially when both cases raise concerns about the constitutionality of the extent of law enforcement's actions.  First, contrary to law enforcement's desire to utilize Mr. Taylor's vehicle's battery to power the GPS Unit, the Seventh Circuit in *Garcia* intimated that the use of a GPS device that draws power from the vehicle's battery could constitute a seizure under the Fourth Amendment.[3]  *See Garcia*, 474 F.3d at 996.  Second, contrary to law enforcement's wish to attach the GPS Unit while Mr. Taylor's vehicle was on public or private property that the public could access, the Seventh Circuit in both *Cuevas-Perez* and *Garcia* specifically highlighted the fact that the GPS device in each of those cases was installed on the vehicles when they were parked in a public area.  *See Cuevas-Perez*, 640 F.3d at 272; *Garcia*, 474 F.3d at 995.

---

[3] The Court notes that it must examine the intended scope of law enforcement's use of the GPS Unit at the time they attached it to Mr. Taylor's vehicle rather than the factual particularities of the GPS Unit's ultimate use.  This is because "the need *vel non* for a warrant depends on the purpose of the GPS use," and thus "the actual course of the GPS use," which is "not known until long after the need for a warrant might arise," is "beside the point."  *Cuevas-Perez*, 640 F.3d at 275.  Here, as in "any other case, the police . . . were obliged to decide *ex ante* whether their contemplated surveillance activities would require a warrant."  *Id.*; *see also id.* at 292 (Wood, J., dissenting) (assessing whether a Fourth Amendment search occurred by analyzing law enforcement's "inten[tion]" when attaching the GPS device because "[t]he need for a warrant must be ascertained at the outset, not with . . . hindsight").

Third and perhaps most importantly, contrary to law enforcement's desire here to utilize the GPS Unit continuously for sixty days, the Seventh Circuit in *Cuevas-Perez* specifically declined to decide whether such lengthy surveillance constituted a Fourth Amendment search. *See* 640 F.3d at 274-76. As noted above, the Seventh Circuit did not reach whether *Maynard* was rightly decided because, unlike in *Maynard*, the GPS tracking "was not lengthy and did not expose, or risk exposing, the twists and turns of [the defendant's] life, including possible criminal activities, for a long period." *Id.* at 274-75.

The Seventh Circuit's reluctance to definitively decide whether the warrantless engagement in lengthy GPS tracking constituted a Fourth Amendment search is telling; at minimum, it precludes reading *Garcia* as broadly holding that the use of a GPS device could *never* constitute a Fourth Amendment search. If the Seventh Circuit read *Garcia* in this manner, there would be no need for *Cuevas-Perez* to have confronted *Maynard*, as *Garcia* would have decided the case. Indeed, as detailed above, the Seventh Circuit's analysis in *Cuevas-Perez* reveals that, had the case been factually analogous to *Maynard*, the Court *might* have found that a Fourth Amendment search occurred.[4] *See Cuevas-Perez*, 640 F.3d at 274. This forecloses the Court from accepting the Government's first position in this case that *Garcia* and *Cuevas-Perez* stand for the rather sweeping proposition that "the warrantless placement and subsequent monitoring of a GPS tracking unit on a defendant's vehicle [does] not violate the defendant's Fourth Amendment rights."[5]

---

[4] This possibility is supported by the fact Judge Flaum, concurring in *Cuevas-Perez*, desired to address *Maynard* and took the position that it was wrongly decided, while Judge Wood, dissenting in *Cuevas-Perez*, agreed with *Maynard* and was of the view that the use of the GPS device in *Cuevas-Perez* was a Fourth Amendment search. *See* 640 F.3d at 276-95.

[5] The Court acknowledges that another district court in this Circuit confronted with a similar issue concluded that the *Davis* good-faith exception did apply to law enforcement's warrantless use of a GPS tracking device prior to the Supreme Court's decision in *Jones*. *See United States v. Rainone*, 2013 WL 2403600, *3 (N.D. Ill. 2013). In that case, however, when law enforcement used the GPS device the then-existing precedent consisted solely of *Garcia*, as *Cuevas-*

[Dkt. 35 at 3.]  As the foregoing discussion reveals, then-binding Seventh Circuit precedent was much more nuanced, and the Government did not attempt to "scrupulously adhere[]" to it when utilizing the GPS Unit to track Mr. Taylor.  *Davis*, 131 S. Ct. at 2434; *cf. see United States v. Katzin*, --- F.3d ----, 2013 WL 5716367, at *19 n.24 (3d Cir. 2013) (warning that "the good faith exception [would] swallow[] the exclusionary rule" if it application depended only on law enforcement's reliance "on a particularly broad-sweeping, self-derived constitutional principle," as "[l]aw enforcement can always derive some constitutional principle from existing decisions").  Therefore, the three difficulties identified by Mr. Taylor, taken together, preclude the application of the *Davis* good-faith exception.[6]

This conclusion is mandated by the rationale underlying the result in *Davis*, and further supported by Justice Sotomayor's concurrence.  Suppression of the evidence in *Davis* led to no meaningful deterrence of wrongful police behavior because the officers who conducted the search followed Eleventh Circuit precedent "to the letter," and the "officers' conduct was in

_____

*Perez* had not yet been decided.  *See id.*  Regardless of whether this Court agrees that *Garcia* alone dictated the result reached in *Rainone*, as explained above, the Seventh Circuit's subsequent decision in *Cuevas-Perez* forecloses such a broad reading of *Garcia*.  Thus, the Court must part ways with the reasoning and result in *Rainone*.

[6] At least three Circuits have held that the good-faith exception does apply in cases factually analogous to the instant case, *see United States v. Sparks*, 711 F.3d 58 (1st Cir. 2013); *United States v. Andres*, 703 F.3d 828 (5th Cir. 2013); *United States v. Pineda-Moreno*, 688 F.3d 1087 (9th Cir. 2012).  Although these cases are not free from criticism, *see Katzin*, --- F.3d ----, 2013 WL 5716367, at *17 n.20, the Court need not consider them in its analysis.  The First, Fifth, and Ninth Circuits all looked to their own then-binding precedent in deciding that the *Davis* good-faith exception applied.  *See Sparks*, 711 F.3d at 65-67; *Andres*, 703 F.3d at 834-35; *Pineda-Moreno*, 688 F.3d at 1090-91.  And the Seventh Circuit has made clear that, in assessing whether the *Davis* good-faith exception applies, the then-binding precedent, as the phrase indicates, must be precedent from the Circuit in which the conduct occurred.  *See United States v. Martin*, 712 F.3d 1080, 1082 (7th Cir. 2013) (noting that "there was no binding appellate precedent in the Eighth Circuit at the time that Iowa law enforcement officials attached the GPS device to [the defendant's] car").  Because the search in questioned happened within the Seventh Circuit, this Court must look only to Seventh Circuit precedent in deciding whether the *Davis* good-faith exception applies, and thus these contrary results from other Circuits are irrelevant.

strict compliance with then-binding Circuit law and was not culpable in any way." *Id.* at 2428. In other words, there can be no deterrence of wrong behavior only "when binding appellate precedent specifically *authorizes* a particular police practice." *Id.* at 2429 (emphasis in original). As the three distinguishing factors relied on by Mr. Taylor show, this is not the case here—that is, *Garcia* and *Cuevas-Perez* did not explicitly authorize the use of a GPS device in the manner or for the length of time law enforcement sought to use it, and indeed, at least suggested that such use of a GPS device implicated protections provided by the Fourth Amendment.

At best, a close reading of *Cuevas-Perez* and *Garcia* demonstrate that many questions regarding the permissible manner and length of the use of GPS devices in accordance with the Fourth Amendment remained unsettled.[7] Justice Sotomayor, in her concurrence in *Davis*, highlighted that the majority's holding extended the good-faith exception to situations where law enforcement relied on settled questions of law derived from binding circuit precedent, but did not answer "the markedly different question whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled." 131 S. Ct. at 2435 (Sotomayor, J., concurring); *see Martin*, 712 F.3d at 1082 (quoting with approval this proposition from Judge Sotomayor's concurrence and declining to extend *Davis*). As Justice Sotomayor pointed out, the answer to the latter question is suggested by prior Supreme Court precedent; albeit in the context of deciding whether to apply a Fourth Amendment holding retroactively, the Supreme Court has recognized that the suppression of evidence can lead to the deterrence of unconstitutional searches and seizures when the relevant Fourth Amendment issue was unsettled at the time of the search. *See Davis*, 131 S. Ct. at 2435 (Sotomayor, J., concurring) ("'If, as the

---

[7] As stated above, the Seventh Circuit in *Cuevas-Perez* explicitly recognized the lack of guidance regarding when the warrantless use of GPS devices was appropriate, and suggested that this should lead law enforcement "to obtain a warrant in close cases." 640 F.3d at 275.

- 15 -

Government argues, all rulings resolving unsettled Fourth Amendment questions should be non-retroactive, then, in close cases, law enforcement officials would have little incentive to err on the side of constitutional behavior.  Official awareness of the dubious constitutionality of a practice would be counterbalanced by official certainty that, so long as the Fourth Amendment law in the area remained unsettled, evidence obtained through the questionable practice would be excluded only in the one case definitively resolving the unsettled question.'") (quoting *United States v. Johnson*, 457 U.S. 537, 561 (1982)).  This is why the Eleventh Circuit in *Davis* limited "its application of the good-faith exception . . . to situations where its 'precedent on a given point [is] unequivocal.'"  *Id.* (Sotomayor, J., concurring) (quoting *United States v. Davis*, 598 F.3d 1259, 1266 & n.9 (11th Cir. 2010)); *accord United States v. Buford*, 632 F.3d 264, 276 (6th Cir. 2011) (agreeing with the Eleventh Circuit that the "precedent on a given point must be unequivocal before we will suspend the exclusionary rule's operation"); *United States v. Curtis*, 635 F.3d 704, 714 (5th Cir. 2011) (same).

In sum, the rationale driving the application of the good-faith exception in *Davis*—that suppression cannot deter wrongful police conduct when law enforcement rely on settled propositions of law—lacks force when the law is unsettled.  When, as here, certain aspects of the law regarding the permissible use of a GPS device is unsettled, suppression of the evidence obtained as a result of the illegal search would lead to appreciable deterrence of potentially unconstitutional law enforcement conduct in that it will create an incentive for law enforcement "to err on the side of constitutional behavior."  *Id.* (Sotomayor, J., concurring) (quoting *Johnson*, 457 U.S. at 561); *see id.* ("[W]hen police decide to conduct a search or seizure in the absence of case law (or other authority) specifically sanctioning such action, exclusion of the evidence obtained may deter Fourth Amendment violations.").

- 16 -

b.   <u>Suppression is Unwarranted Because Law Enforcement's Reliance on the Judicial Authorization They Received to Use the GPS Unit was Objectively Reasonable</u>

Despite the Court's conclusion that the *Davis* good-faith exception does not apply, the Court agrees with the Government that suppression is unwarranted.  As argued by the Government, "Detective Schwomeyer's good faith is demonstrated by his consultation with Deputy Prosecuting Attorney Andrea Props in seeking judicial review and approval before installing and monitoring a GPS device on the defendant's vehicle." [Dkt. 35 at 4-6.]  The Court agrees.  In the end, it is not, as discussed above, law enforcement's good-faith reliance on Seventh Circuit precedent that precludes suppression in this case, but it is their objectively reasonable reliance on the judicial authorization they received to use the GPS Unit that renders suppression an inappropriate remedy.  The parties have not cited, nor is the Court aware of, a Seventh Circuit case with facts analogous to those here—*i.e.*, where the judicial authorization on which law enforcement relied was not a search warrant issued after a probable cause determination.  However, both the good-faith exception established in *Leon* and the principles animating the exclusionary rule as articulated in *Davis* are instructive.

Even if a specifically recognized good-faith exception does not apply, such as that recognized in *Davis* or *Leon*, suppression is not automatically warranted.  The Court still must independently assess in each given case whether the exclusionary rule should apply.  *See Katzin*, --- F.3d ----, 2013 WL 5716367, at *17 (holding that the *Davis* good-faith exception did not apply, but considering next "whether law enforcement personnel acted with an 'objectively reasonable good-faith belief that their conduct [was] lawful'" by "undertak[ing] the balancing test outlined in . . . *Davis*) (alteration in original) (quoting *Davis*, 131 S. Ct. at 2427).  This is because the Supreme Court has made clear that any assessment of whether the exclusionary rule applies always

requires a "rigorous weighing of its costs and deterrence benefits." *Davis*, 131 S. Ct. at 2427; *see Guzman v. City of Chicago*, 565 F.3d 393, 398 (7th Cir. 2009) ("[T]he benefits of exclusion must outweigh the costs."). Suppression imposes a "heavy toll" on "both the judicial system and society at large," as it "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Id.*; *see Illinois v. Krull*, 480 U.S. 340, 352-53 (1987) (holding that the "incremental deterrent" gained by suppression "must be weighed against the 'substantial social costs exacted by the exclusionary rule'") (quoting *Leon*, 468 U.S. at 907). And "the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." *Davis*, 131 S. Ct. at 2427 (alteration in original) (quoting *Herring v. United States*, 555 U.S. 129, 143 (2009)); *see United States v. Williams*, --- F.3d ----, 2013 WL 5314594, at *10 ("[C]ourts should not exclude evidence unless the actions in question were 'sufficiently deliberate that exclusion can meaningfully deter' similar actions in the future, and that the actions were 'sufficiently culpable that such deterrence is worth the price paid by the judicial system.'") (quoting *Herring*, 555 U.S. at 144). Specifically, the exclusionary rule is only meant to deter future conduct of law enforcement that is "deliberate, reckless, or grossly negligent." *Herring*, 555 U.S. at 144. Therefore, any time the "police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Davis*, 131 S. Ct. at 2427-28 (citations and quotation marks omitted).

Here, the Court cannot conclude that law enforcement's conduct was anything but objectively reasonable; it certainly was not reckless or grossly negligent. Instead of unilaterally deciding that they could attach the GPS Unit to Mr. Taylor's car, law enforcement sought *and received* judicial authorization to use the GPS Unit from the Marion Superior Court. [*See* dkt. 33-

3.]  Although the Government conceded that the authorization was not the equivalent of a search

warrant, [dkt. 35 at 4 n.4], it was nonetheless permission from a "detached and neutral magis-

trate" to use the GPS Unit in the manner they did, *Leon*, 468 U.S. at 900.  The fact that the judi-

cial authorization on which law enforcement relied did not, as in *Leon*, take the form of a search

warrant, does not undermine the rationale underlying *Leon*—namely, that the exclusionary rule

"should not be applied" when law enforcement "acted in the objectively reasonable belief that

their conduct did not violate the Fourth Amendment."  *Id.* at 918-19.  When law enforcement

seek and obtain judicial approval for the precise conduct in which they seek to engage, their be-

lief that they did not violate the Fourth Amendment is an objectively reasonable one.[8]  True, law

enforcement could have obtained a search warrant before using the GPS Unit.  But, again, the

Court cannot conclude that their decision otherwise was anything but reasonable in light of the

judicial authorization they received to use the device without a search warrant.

In sum, the heavy costs of suppression do not outweigh its benefits in this case.  When, as

here, law enforcement officers seek judicial authorization for their actions—a step that courts

should not discourage—and they receive such authorization, it is objectively reasonable for them

to believe that the authorized actions do "not violate the Fourth Amendment."  *Id.* at 918.  Ac-

tions taken pursuant to judicial authorization certainly do not evince the "disdain for constitu-

tional requirements" the exclusionary rule seeks to deter.  *United States v. Woolsey*, 535 F.3d

540, 546 (7th Cir. 2010) (quoting *United States v. Cazares-Olivas*, 515 F.3d 726, 728 (7th Cir.

2008)).  And if, as here, suppression would not result in the appreciable deterrence of the type of

law enforcement conduct the exclusionary rule is meant to deter—*i.e.*, that which is culpable—

---

[8] It is irrelevant to the suppression inquiry whether that judicial authorization was ultimately
proper, as the purpose of the exclusionary rule is to deter wrongful law enforcement conduct, not
errors made by the judiciary.  *See Leon*, 468 U.S. at 916; *see also Arizona v. Evans*, 514 U.S. 1,
14-16 (2009).

there is insufficient deterrence value to outweigh the costs of suppression.  Therefore, application

of the exclusionary rule is not appropriate.  *See Davis*, 131 S. Ct. at 2427 ("Real deterrence value

is a 'necessary condition for exclusion' . . . .") (quoting *Hudson v. Michigan*, 547 U.S. 586, 596

(2006)).

Accordingly, suppression of the evidence obtained from Mr. Taylor's storage locker is

unwarranted because law enforcement reasonably relied on the judicial authorization they re-

ceived to use the GPS Unit to track Mr. Taylor's vehicle.

### B.    Mr. Taylor is not Entitled to Suppression due to an Alleged Material Omission in the Search Warrant Application

Mr. Taylor makes a rather perfunctory argument that the evidence from his storage unit

must be suppressed on the additional ground that "[t]he search warrant application for the storage

unit leaves the false impression that the discovery of Taylor's connection to the Hoosier Storage

facility . . . was the product of random human surveillance rather than constant, 24 hour inten-

sive, electronic GPS monitoring."  [Dkt. 33 at 15.]  His entire argument, however, consists of the

conclusory assertion that "[i]t can hardly be argued that the GPS monitoring was not material" to

law enforcement connecting Mr. Taylor to the Hoosier Storage facility.  [*Id.*]  The Government

disagrees, arguing that Mr. Taylor has not established the factors necessary to establish a consti-

tutional violation.  [Dkt. 35 at 7-9.]  The Court agrees with the Government on this issue.

In the seminal case on this issue, the Supreme Court stated that "[t]here is . . . a presump-

tion of validity with respect to the affidavit supporting the search warrant.  To mandate an evi-

dentiary hearing, the challenger's attack must be more than conclusory . . . .  There must be alle-

gations of deliberate falsehood or of reckless disregard for the truth, and those allegations must

be accompanied by an offer of proof."   *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  The

Seventh Circuit has interpreted *Franks* to require a defendant to make a "substantial preliminary

- 20 -

showing" that "(1) the affidavit contained a false material statement; (2) the affiant made the false statement intentionally, or with reckless disregard to the truth; and (3) the false statement is necessary to support the finding of probable cause."  *United States v. Maro*, 272 F.3d 817, 821 (7th Cir. 2001); *see United States v. Smith*, 576 F.3d 762, 765 (7th Cir. 2009) (same).  Not only did Mr. Taylor not allege that the affidavit at issue contained deliberate falsehoods or evinced a reckless disregard for the truth, he offers no proof to support the only assertion that he does make, which precludes success on this claim.  *See Franks*, 438 U.S. at 171; *cf. United States v. Johnson*, 580 F.3d 666, 671 (7th Cir. 2009) ("If [the defendant] believes that [the police officer] lied, he must support that allegation with an offer of proof . . . .").  Because evidence is required to corroborate claims such as these, Mr. Taylor's single conclusory assertion in support of his position is certainly insufficient.  *See Johnson*, 580 F.3d at 671 ("Conclusory, self-serving statements are not enough to obtain a *Franks* hearing."); *United States v. Souffront*, 338 F.3d 809, 823 (7th Cir. 2003) ("The presumption of validity cannot be overcome by defendant's self-interested inference and conclusory statements.").

Accordingly, because Mr. Taylor has not carried his burden to "make a substantial preliminary showing" that he is entitled to a *Franks* hearing, he will not receive such a hearing, nor is he entitled to the suppression of evidence on this basis.

### C.   The Dog Sniff Law Enforcement Conducted on Mr. Taylor's Storage Unit was not a Search within the Meaning of the Fourth Amendment

Mr. Taylor also argues that the evidence found in Hoosier Storage Unit #1134 should be suppressed because the dog sniff that revealed the presence of narcotics in the storage unit, which allowed law enforcement to obtain the search warrant, constituted an illegal Fourth Amendment search.  [Dkt. 33 at 15-20.]  The Government contends that the dog sniff was not a Fourth Amendment search and, even if it was, the good-faith exception to the exclusionary rule

should preclude suppression of the discovered evidence.  [Dkt. 35 at 6-7, 9-15.]  In the end, the Court need not address whether the good-faith exception applies because it agrees with the Government that the dog sniff did not constitute a Fourth Amendment search.

Mr. Taylor's argument focuses primarily on the Supreme Court's recent decision in *Florida v. Jardines*, 133 S. Ct. 1409 (2013).  [Dkt. 33 at 16-17.]  Because Mr. Taylor seemingly relies on both the majority opinion and Justice Kagan's concurrence in *Jardines*, an explanation of both is necessary to address his position.  In *Jardines*, the Supreme Court held that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment."  *Id.* at 1417-18.  Such conduct was deemed a Fourth Amendment search because the law enforcement "officers were gathering information in an area belonging to [the defendant]  . . . in the curtilage of the house, which [the Supreme Court has] held enjoys protection as part of the home itself.  And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner."  *Id.* at 1414.  Because the officers physically intruded into the curtilage of the defendant's home to perform a dog sniff without the defendant's consent, the majority did not reach the question of whether the conduct would also have constituted a Fourth Amendment search under the well-known "reasonable expectation of privacy" test derived from Justice Harlan's concurrence in *Katz v. United States*, 389 U.S. 347 (1967).  *See Jardines*, 133 S. Ct. at 1417 ("The *Katz* reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas.") (quoting *Jones*, 132 S. Ct. at 951-52).

Justice Kagan, joined by Justices Ginsburg and Sotomayor, concurred in *Jardines*, and would have also held that the search was invalid under the *Katz* rubric. *See Jardines*, 133 S. Ct. at 1418 (Kagan, J., concurring). Pursuant to *Katz*, a Fourth Amendment search does not occur "unless the individual manifested a subjective expectation of privacy in the searched object, and society is willing to recognize that expectation as reasonable." *Kyllo v. United States*, 533 U.S. 27, 28-29 (2001). In Justice Kagan's view, this test was met in *Jardines* for essentially the same reasons relied on by the majority—namely, law enforcement intruded on the defendant's home, which is the ultimate private sphere. *See Jardines*, 133 S. Ct. at 1419 (Kagan, J., concurring). As Justice Kagan explained, "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align." *Id.* (Kagan, J., concurring).

Neither the *Jardines* majority's rationale, nor that in Justice Kagan's concurrence, support Mr. Taylor's position that the dog sniff in the instant case was a Fourth Amendment search. The majority's opinion was driven entirely by the fact that the dog sniff occurred in the curtilage of the defendant's home, which exceeded the scope of the limited license law enforcement had to enter the property. *See* 133 S. Ct. at 1414 (recognizing that, under the Fourth Amendment, "the home is first among equals" of constitutionally protected spaces, and that the constitutional protection given to the home was violated when law enforcement "gathered . . . information by physically entering and occupying the [curtilage of the home] to engage in conduct not explicitly or implicitly permitted by the homeowner"). This case, of course, does not implicate this concern, as the dog sniff occurred on Hoosier Storage's property immediately outside of the storage unit rented by Mr. Taylor.

It is thus perhaps unsurprising that Mr. Taylor focuses primarily on Justice Kagan's concurrence to support his position. Specifically, Mr. Taylor contends that, like Justice Kagan's

concurrence in *Jardines*, the *Katz* test is met here because he had a subjective expectation of privacy in Unit #1134 at Hoosier Storage that society would recognize as reasonable, since storage units, like the home, "are secure areas that command a high degree of privacy." [Dkt. 33 at 19 (quotation marks omitted).]   The Government responds that *Jardines* does not control the search of a storage unit.  [Dkt. 35 at 6-7.]  Focusing on the *Katz* test, the Government argues that "the same privacy concerns that exist with the curtilage of a home are simply not analogous to those of the front of a storage unit that is located inside a business."  [*Id.* at 6.]  The analogy is inapposite, the Government explains, because, "[u]nlike the area around the front of a residence . . . which is a constitutionally protected area, the only privacy interest that Mr. Taylor had by renting unit 1134 at Hoosier Storage was inside that particular storage space."  [*Id.*]  The Court agrees with the Government.

Justice Kagan's concurrence fails to advance Mr. Taylor's claim because her rationale relied as much on the fact that law enforcement conducted the dog sniff by "entering the premises" of defendant's home as much as the majority's did.  *See id.* at 1418-19 (Kagan, J., concurring) (noting that a decision under the *Katz* rubric "would have looked . . . well, much like [the majority's decision]"); *see also id.* at 1418-19 (Kagan, J., concurring) (emphasizing, in concluding that the *Katz* test was met, that "privacy expectations are most heightened in the home and surrounding area"; that "police officers invade those shared expectations when they use trained canine assistants to reveal *within the confines of a home* what they could not otherwise have found there"; that the home is "an especially private sphere"; and that the defendant's home was "his most intimate and private space") (emphasis added) (citation and quotation marks omitted).  Justice Kagan's recognition that, at least in the Fourth Amendment realm, the home is sacrosanct led her to conclude that "police officers cannot [use a narcotics dog] to examine a home without

a warrant or exigent circumstance." *Id.* at 1420 (Kagan, J., concurring).  Again, such reasoning

fails to assist Mr. Taylor because the dog sniff at issue here involved the common area outside

his storage unit rather than the home.

Perhaps more importantly, even assuming Justice Kagan's concurrence lends credence to

Mr. Taylor's position, it remains a concurrence, joined only by three justices.  It thus cannot

serve to overrule or abrogate prior precedent establishing that dog sniffs conducted by law en-

forcement from an area they have a legal right to be do not constitute a Fourth Amendment

search.  *See United States v. Brock*, 417 F.3d 692, 697 (7th Cir. 2005) (holding that a dog sniff

conducted outside the defendant's room in a house was not a Fourth Amendment search because

"police were lawfully present inside the common areas of the residence with the consent of [the

defendant's] roommate"); *see also Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 628 (7th

Cir. 2008) ("K-9 units trained to detect contraband do not conduct a search when they sniff in an

area where they are lawfully present.").  Here, the dog sniff occurred outside Hoosier Storage

Unit #1134 after an employee gave law enforcement permission to be there.[9]  Therefore, this

case is governed by *Brock*, which, even post-*Jardines*, remains binding precedent for this Court.

The Seventh Circuit made clear in *Brock* that, if law enforcement has the authority to

conduct a dog sniff from their location, the dog sniff itself does not transform the conduct into a

Fourth Amendment search, even under the *Katz* rubric.  *See Brock*, 417 F.3d at 697 ("Everything

behind [the defendant's] locked bedroom door remained undetected except the narcotics, which

[the defendant] had no right to possess in the first place.").  This is because the Supreme Court

has consistently held that one does not have an expectation of privacy in the scent of contraband.

*See Illinois v. Caballes*, 543 U.S. 405, 408 (2005) ("[A]ny interest in possessing contraband can-

not be deemed 'legitimate,' and thus, governmental conduct that only reveals the possession of

contraband 'compromises no legitimate privacy interest.'") (quoting *United States v. Jacobson*,

466 U.S. 109, 124 (1984)); *see also Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000); *United*

---

[9] As evidence of Mr. Taylor's subjective and objective expectation of privacy in his storage unit at Hoosier Storage, Mr. Taylor points the Court to a provision in his rental agreement with Hoosier Storage that required Hoosier Storage to provide three days prior written notice to Mr. Taylor before government officials, including police officers, were given "access to the Premises." [Dkt. 37-1 at 2.]  But even assuming that a contract provision such as this bears on the Fourth Amendment analysis, this provision was never violated or even implicated by the dog sniff.  The rental agreement defines "Premises" as the storage unit itself, not the Hoosier Storage facility. [*Id.* at 1.]  Thus, the notice provision was never triggered because the Hoosier Storage employee did not give law enforcement consent to physically search the storage unit, nor did law enforcement do so at the time of the dog sniff.  Moreover, even if "Premises" did refer to the area immediately outside Mr. Taylor's storage unit, any expectation of privacy the rental agreement originally created no longer existed when Mr. Taylor breached the terms of the rental agreement by storing narcotics in his storage unit.  By the terms of the rental agreement, storing illegal contraband in the storage lockers was not permitted, [*see id.* at 2], and if done, permitted the search of the storage unit at any time, [*id.* at 2 ("[I]n the event of a[] . . . default of any of Renter's obligation under the Rental Agreement, Owner . . . or the representative of any governmental authority shall have the right . . . to remove Renter's locks and enter the Premises for the purpose of examining the Premises . . . .")].

*States v. Place*, 462 U.S. 696, 707 (1983).[10]  And as explained above, nothing in *Jardines* disturbed this well-settled proposition.[11]

The foregoing requires the Court to conclude that the dog sniff was not a Fourth Amendment search.  As in *Brock*, the dog sniff left everything in Mr. Taylor's storage unit undetected except for the presence of narcotics, and the presence of narcotics was detected from an area "where police were present by consent[]," as a Hoosier Storage employee allowed law en-

---

[10] Mr. Taylor makes the somewhat perplexing argument that "*the Supreme Court's* focus on the nature of the item sought [in *Caballes*, *Edmond*, and *Place*], and its conclusion that there is no legitimate expectation of privacy in contraband, is . . . constitutionally unsound." [Dkt. 33 at 17-18 (emphasis added).]  It is, of course, the Supreme Court's prerogative to craft the appropriate Fourth Amendment inquiry and this Court's duty to follow binding precedent.  Thus Mr. Taylor's reliance on *Byars v. United States*, 273 U.S. 28, 29 (1927), to argue that these more recent Supreme Court cases—which explicitly hold that "governmental conduct that only reveals the possession of contraband 'compromises no legitimate privacy interests,'" *Caballes*, 543 U.S. at 408 (quoting *Jacobson*, 466 U.S. at 124)—is a non-starter.  Mr. Taylor makes a similar misstep in arguing that Justice Kagan's concurrence represents a "shift" in Fourth Amendment jurisprudence away from the analysis applied in *Caballes* and *Place*, which should lead only this Court to conclude that that analysis "does not apply."  [Dkt. 39 at 11.]  Not only does the Court disagree with Mr. Taylor's reading of Justice Kagan's concurrence, but more importantly, the Court is bound by Supreme Court precedent, which of course cannot be overruled, or even "shift[ed]," by a three-Justice concurrence.

[11] Mr. Taylor relies on a Tenth Circuit case for the proposition that he has "a reasonable expectation of privacy in [his] storage unit."  [Dkt. 33 at 18 (citing *United States v. Johnson*, 584 F.3d 995, 1001 (10th Cir. 2009)).]  While this very well may be true, it does not answer the question the Court must ask—namely, whether he has a reasonable expectation of privacy in the scent of contraband emanating from his storage unit.  As discussed above, the answer to the question is a definitive "no."  *See Caballes*, 543 U.S. at 408; *Brock*, 417 F.3d at 695-97.  Indeed, the Tenth Circuit asserted that an individual has a reasonable expectation of privacy in a storage unit in a case involving the physical search of the storage unit itself, rather than a dog sniff conducted immediately outside of the unit.  *See Johnson*, 584 F.3d at 998.  Thus, *Johnson* is inapposite and fails to advance Mr. Taylor's position.

forcement to occupy the space outside Mr. Taylor's storage unit, and thus the dog sniff "did not

violate defendant's Fourth Amendment rights."[12]  *Brock*, 417 F.3d at 697.

Accordingly, because the dog sniff of Hoosier Storage Unit #1134 did not constitute a

Fourth Amendment search, it does not provide a basis to suppress the evidence subsequently dis-

covered therein.

### III.
### CONCLUSION

For the reasons explained, the Court **DENIES** Mr. Taylor's Motion to Suppress.  [Dkt.

32.]

10/29/2013

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana


**Distribution via ECF only**:

Stephen G. Gray
ATTORNEY AT LAW
misstuffy@aol.com

Todd Eric Ess
TODD ESS
todderic@comcast.net

---

[12] The Seventh Circuit's decision in *Brock* also undermines Mr. Taylor's attempt to distinguish *Caballes* and *Place* on the ground that those cases involved dog sniffs of "inherently mobile objects (i.e., automobiles, luggage) found in public places (i.e., public roads, airports)."  [Dkt. 39 at 11.]  In *Brock*, the Seventh Circuit relied on both *Caballes* and *Place* in holding that the dog sniff of an immobile space—the defendant's bedroom—which was located in a private rather than a public space—a private residence—was not a Fourth Amendment search.  *See* 417 F.3d at 695-97.  Thus, like in *Brock*, the principles established in *Caballes* and *Place* are applicable here, even though the dog sniff was of an immobile object (Mr. Taylor's storage unit) and occurred in a private space (the Hoosier Storage facility).

Barry D. Glickman
UNITED STATES ATTORNEY'S OFFICE
barry.glickman@usdoj.gov

William Lance McCoskey
UNITED STATES ATTORNEY'S OFFICE
william.mccoskey@usdoj.gov